UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JLI INVEST S.A., and LIN INVEST S.A., | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Civil Action No. 15-cv-11474-ADB |
| | * | |
| COMPUTERSHARE TRUST COMPANY, | * | |
| N.A., et al. | * | |
| | * | |
| Defendants. | * | |

**MEMORANDUM AND ORDER ON DEFENDANTS' MOTION TO STAY**

Plaintiffs, who were former shareholders of a biotechnology company, allege that the

Defendants wrongfully escheated their shares to the state of Delaware, on the erroneous

assumption that Plaintiffs' shares had been abandoned. Before the Court is Defendants' Motion

to Stay this action, pending the resolution of a related litigation filed in the state of Delaware.

[ECF No. 35]. Defendants urge the Court to stay this case based on the abstention doctrines set

forth in Colorado River Water Conservation District v. United States, 424 U.S. 800 (1976);

Burford v. Sun Oil Co., 319 U.S. 315 (1943); and/or Railroad Commission of Texas v. Pullman

Co., 312 U.S. 496 (1941). For the reasons set forth in this Memorandum and Order, Defendants'

Motion is DENIED without prejudice to renew after the close of discovery.

I.      **FACTUAL AND PROCEDURAL BACKGROUND**

      **A. Facts Alleged in the Complaint**

Plaintiffs JLI Invest S.A. ("JLI") and LIN Invest S.A. ("LIN") (together, "Plaintiffs") are

Belgian entities with principal places of business in Brussels. JLI is 99.99% owned by Dr. Gilles

Gosselin and 0.01% by Dr. Jean Louis Imbach. LIN is 99.99% owned by Dr. Imbach, and 0.01%

by Dr. Gosselin.

In 1997, Dr. Gosselin and Dr. Imbach headed a research team that synthesized a new Hepatitis B drug. The following year, Dr. Imbach, Dr. Gosselin, and others founded a biopharmaceutical company called Idenix Pharmaceuticals, Inc. ("Idenix"), to develop the drug in collaboration with Novartis Pharma AG and other entities. Plaintiffs allege that Drs. Gosselin and Imbach were key participants in Idenix's business and were well known to Idenix senior management, including top executives and directors.

Idenix was organized as a Delaware corporation, with a principal place of business in Cambridge, Massachusetts. LIN owned 320,000 shares of Idenix, and JLI owned 240,000 shares. Plaintiffs allege, upon information and belief, that they were among the largest Idenix shareholders, and that Idenix was aware that Dr. Gosselin and Dr. Imbach had created JLI and LIN to hold their shares in the company. Plaintiffs contend that at all relevant times, they had physical possession of their stock certificates.

Beginning in 2005, Defendant Computershare[1] acted as Idenix's stock transfer agent. In addition to providing transfer agent services, Computershare also agreed to provide services related to the escheatment of Idenix's abandoned or unclaimed securities. Those services included, for example, locating lost shareholders, communicating with shareholders to prevent escheatment of shares, and determining whether any Idenix shares had been abandoned. Plaintiffs contend that, as shareholders of Idenix, they were the third party beneficiaries of Computershare's agreement with Idenix.

Plaintiffs further allege that at all relevant times, both Computershare and Idenix had written records of Plaintiffs' mailing addresses in Brussels. They also contend that Idenix

---

[1] The Complaint names Computershare Trust Company, N.A., Computershare Inc., and Computershare Investor Services, LLC as Defendants. The Court will refer to these entities collectively as "Computershare."

periodically communicated with and sent correspondence to Plaintiffs regarding their shares, and that no such correspondence sent to Plaintiffs was ever returned to Idenix or Computershare as undeliverable.

Under Delaware's state escheat statute, holders of unclaimed or abandoned property subject to Delaware's jurisdiction are required to report and remit such property to the State of Delaware. See 12 Del. C. §§ 1199, 1201. Plaintiffs allege that in November 2008, Computershare, acting as Idenix's agent, erroneously reported to the State of Delaware that Plaintiffs' 560,000 shares of Idenix had been "abandoned" and constituted "unclaimed property." On January 2, 2009, Computershare escheated Plaintiffs' shares to the State of Delaware. Neither Computershare nor Idenix attempted to contact Plaintiffs prior to escheating their shares, despite the fact that Idenix and Computershare had been in regular contact with Plaintiffs on other matters. Nor did the State of Delaware contact Plaintiffs to inform them that their shares were about to be, or had been, escheated.

Plaintiffs did not learn that their shares had been escheated until March 30, 2011, after Plaintiffs made inquiries to Computershare about their stock. According to Plaintiffs, Computershare and Idenix attempted to justify the escheat by pointing to a June 30, 2008 amendment to the Delaware Escheats Law, see 12 Del. C. § 1198(9), which changed the rules governing the report and escheat of unclaimed property. Plaintiffs argue that Computershare and Indenix's interpretation of these amendments is incorrect, and that their escheat of Plaintiffs' shares was done unlawfully and in bad faith. They allege that neither Computershare nor Idenix ever contacted Plaintiffs to alert them of a change in Delaware's unclaimed property laws that would result in the automatic escheat of shares unless immediate action were taken. In fact, Plaintiffs allege that Computershare sent periodic securities account statements to them and other

shareholders, which affirmatively stated that "No action on your part is required, unless you wish to deposit your existing certificates, sell or request a certificate, or transfer your book-entry shares." <u>See</u> Complaint [ECF No. 10] ("Compl.") ¶ 53. Plaintiffs also allege, on information and belief, that Computershare did not begin including any type of disclosure to shareholders regarding the potential escheat of shares until 2014, long after Plaintiffs' shares had been escheated.

Plaintiffs also contend that when Computershare finally informed them, in March of 2011, that their shares had been escheated, the information Computershare communicated was incorrect. Specifically, Computershare erroneously reported that Plaintiffs' shares had been escheated to the Commonwealth of Massachusetts. As a result of this misinformation, Plaintiffs expended substantial time, effort, and expense in trying to determine the whereabouts of their shares.

After Plaintiffs learned that their shares had actually been escheated to the State of Delaware, they filed a claim with the Delaware Office of Unclaimed Property ("DOUP") in September 2012. The DOUP requested documentation from Plaintiffs, which they provided in October and December of 2012.

Around the same time period, Plaintiffs requested documentation from Computershare and Idenix, including proof that their shares had been escheated. Computershare and Idenix did not immediately respond to Plaintiffs' requests, and were delinquent in providing the requested assistance. As a result, Plaintiffs were not able to obtain proof that their shares had been escheated to Delaware until May 2014.

In October 2014, Plaintiffs further learned that the State of Delaware had liquidated their shares. Delaware reported that it had sold the shares in a series of transactions between March

24, 2009, and April 6, 2009, shortly after the shares were escheated. JLI's shares were sold for $726,792.00, and LIN's shares were sold for $969,059.75.[2]

Plaintiffs allege that these amounts do not reflect, and are in fact substantially lower than, the true value of Plaintiffs' shares, because at the time the shares were liquidated, very few investors were buying or selling Idenix stock. As proof that their shares were undervalued at the time of liquidation, Plaintiffs note that in June 2014, Idenix entered into an agreement with Defendant Merck & Co., Inc. ("Merck"), under which Merck would acquire Idenix for $24.50 per share in cash. Plaintiffs allege that had their shares not been wrongfully escheated, they would have been eligible to participate in—and would have participated in—this tender offer. The tender offer was completed on August 4, 2014, at which time all existing Idenix shares were cancelled and converted into the right to receive cash, equal to the $24.50 per share offer. Plaintiffs contend that if their shares had not been escheated, LIN would have received $7,840,000 for its 320,000 shares and JLI would have been entitled to receive $5,880,000 for its 240,000 shares pursuant to the Merck tender offer.

### B. Plaintiffs' Administrative Appeal before the Delaware Tax Appeal Board

Since learning that their shares had been escheated to Delaware, Plaintiffs have been pursuing a claim before the DOUP. In March 2015, Plaintiffs submitted a completed claim form, which requested that the DOUP provide Plaintiffs with their 560,000 shares of Idenix stock, or the current fair market value thereof, which—based on the Merck tender offer—is $13,720,000.

On March 31, 2015, the DOUP informed Plaintiffs that while it would not pay them the requested $13,720,000, it would refund Plaintiffs in the amount of $1,695,851.75, which represented the actual proceeds earned through the 2009 sale of Plaintiffs' Idenix stock. Plaintiffs

---

[2] Based on the Court's calculations, the shares would have been liquidated at a price of approximately $3.03 per share.

accepted a check under protest, and the State of Delaware agreed that Plaintiffs' acceptance of these funds would not prejudice their rights to pursue their claims for the remainder.

Under Delaware law, a property owner dissatisfied with the determination of its claim by the Delaware State Escheator may appeal that determination to the Delaware Tax Appeal Board (the "TAB"). See 12 Del. C. § 1146(b). Accordingly, on July 28, 2015, Plaintiffs filed a Petition with the TAB, challenging the Delaware State Escheator's determination that Plaintiffs were only entitled to the $1,695,851.75 in proceeds from the 2009 sale of their stock. See Declaration of Savvas A. Foukas [ECF No. 37] ("Foukas Decl."), Ex. C. The Petition, which names only the Delaware State Escheator as a defendant, asserts eleven claims for relief, including that the Escheator violated the Delaware Escheats Law; the federal common law; Plaintiffs' due process rights under the United States Constitution and the Delaware state constitution; the Takings Clauses of both constitutions; the federal Commerce Clause; and the Friendship, Establishment and Navigation Treaty between the United States and Belgium (the "FEN Treaty"). See id. The Petition further alleges that the State Escheator is liable for negligence and conversion. In addition to damages, Plaintiffs request injunctive and declaratory relief.

At the present time, discovery in the TAB proceeding appears to be complete, and the parties are currently briefing the matter. See Joint Status Report [ECF No. 58]. Briefing will be complete on October 28, 2016, and the TAB is expected to issue a decision sometime thereafter. See id. After the TAB renders a decision, either party may appeal that decision to the Delaware Court of Chancery. See 12 Del. C. § 1146(c).

**C. The Delaware Chancery Lawsuit**

Separate and apart from their claim before the TAB, Plaintiffs filed an additional lawsuit in the Delaware Court of Chancery on July 9, 2015. See Foukas Decl., Ex. A (the "Chancery

action"). The defendants in the Chancery action are several Delaware state officials in their individual and official capacities. See id.

Count I of Plaintiffs' complaint alleges that the Defendants violated the Delaware Escheats law because, *inter alia*, (1) Plaintiffs' shares were not "lost or abandoned"; (2) the law does not permit the escheat of foreign-owned shares; (3) defendants retroactively applied the 2008 amendment to the Escheat Law to Plaintiffs; (4) defendants were not acting in good faith when they liquidated Plaintiffs' shares; (5) defendants failed to publish the fact that Plaintiffs' shares had been escheated, and failed to pay Plaintiffs fair market value for their property; and (6) defendants unduly delayed in processing Plaintiffs' claims with respect to their shares, and provided Plaintiffs with false or incorrect information.

In Count II, Plaintiffs allege that the escheat of their shares violated the federal common law, which prevents the escheat of foreign-owned property.

In Count III, Plaintiffs allege that the defendants violated Plaintiffs' due process rights under the United States and Delaware state constitutions by, *inter alia*, (1) escheating Plaintiffs' shares without notice, (2) failing to require Computershare and/or Idenix to notify Plaintiffs of the same; (3) wrongfully escheating Plaintiffs' shares in violation of federal and Delaware state law; (4) failing to attempt to return Plaintiffs' shares to them prior to liquidation; (5) causing undue delay in the processing of Plaintiffs' claims; and (6) retroactively applying the 2008 amendments to the Delaware Escheats Law. Plaintiffs also contend that the Delaware Escheats Law itself violates Plaintiffs' due process rights, because it merely requires notice to owners of escheated property via annual publication in a daily newspaper.

In Count IV, Plaintiffs allege that the escheat of their shares violates the Takings Clauses of the United States and Delaware constitutions. Count V alleges that the defendants' actions

7

violated the Commerce Clause of the United States Constitution. Count VI alleges that the defendants violated the FEN Treaty between the U.S. and Belgium.

Counts VII and VIII allege that the defendants are liable for negligence and conversion. Finally, Count IX alleges that certain individual defendants are liable under 42 U.S.C. § 1983 by depriving Plaintiffs of their federal and constitutional rights under the color of state law. Plaintiffs seek more than $12,000,000 in damages, plus declaratory and injunctive relief.

All parties to the Chancery action agreed that the action should be stayed pending resolution of Plaintiffs' petition before the TAB. See Stipulation to Stay Proceedings [ECF No. 55-1]. The Delaware Chancery Court granted the parties' motion to stay in November 2015. Id. Thus, the Chancery action has not advanced past the pleadings stage and remains stayed at the present time.

### D.  This Lawsuit

Plaintiffs filed the instant lawsuit on March 30, 2015, several months before filing either the TAB appeal or the Chancery action. Plaintiffs, however, did not serve any defendant with process until July 24, 2015, after they had filed and effected service of the complaint in the Chancery action.

The operative Complaint [ECF No. 10] names six defendants: the three Computershare entities; Idenix; Merck; and Imperial Blue Corporation, which is another wholly-owned subsidiary of Merck. See Compl. ¶¶ 3–8.[3] Unlike the TAB appeal or the Chancery action, no Delaware officials are named as defendants in this case.

---

[3] Although this issue is not immediately relevant to the Motion to Stay, Defendants contend that Imperial Blue no longer exists pursuant to its August 2014 merger into Idenix. See Foukas Decl., Ex. B.

Count I asserts a negligence claim against all Defendants, on the grounds that Computershare and Idenix breached their duties of care to Plaintiff shareholders by, *inter alia*: (1) wrongfully escheating Plaintiffs' shares; (2) failing to conduct due diligence prior to the escheat, in violation of state and federal law, including 17 C.F.R. § 240.17Ad-17; (3) failing to contact Plaintiffs before escheating their shares, even though Defendants knew how to contact Plaintiffs; (4) in Computershare's case, failing to inquire with Idenix regarding Plaintiffs' contact information and their relationship with Idenix, and in Idenix's case, failing to inform Computershare of such contact information and relationships; (5) failing to provide sufficient information to the State of Delaware to enable Delaware to return Plaintiffs' shares to them; (6) failing to notify Plaintiffs that their shares would be or had been escheated; (7) misrepresenting to Plaintiffs that their shares had been escheated to Massachusetts, which caused a lengthy delay in Plaintiffs' efforts to recover their shares; and (8) failing to disclose to Plaintiffs in any written document that their shares could be subject to escheat under certain circumstances, that the relevant state law on such issues had changed, or that such amendments would result in the automatic escheat of Plaintiffs' shares unless immediate action was taken. Plaintiffs further contend that Merck, as successor in interest to Idenix, is liable for Idenix's negligent acts and omissions. Plaintiffs allege that as a result of the Defendants' negligence, Plaintiffs lost over $12,000,000.

Count II alleges that Defendants violated Mass. Gen. Laws ch. 93A, § 2 by willingly, knowingly, and recklessly engaging in unfair and/or deceptive acts or practices. The factual allegations supporting the Chapter 93A claim in Count II are similar to those alleged in Count I.

Count III alleges that all Defendants are liable for conversion. In Count IV, Plaintiffs assert a claim for breach of contract, on the grounds that they were the third-party beneficiaries

of the contract between Computershare and Idenix, including any indemnity provisions therein. Plaintiffs contend that both parties breached their respective obligations under the contract, and that Plaintiffs were damaged as a result. Similarly, Count V alleges that the Defendants breached the implied covenant of good faith and fair dealing associated with that contract, in an effort to deprive Plaintiffs of the benefit of that contract.

Count VI alleges that Idenix and Merck breached their fiduciary duties to the Plaintiffs, to safeguard and protect their shares, to maintain accurate books and records, to avoid making untrue statements of material fact or material omissions, and to refrain from engaging in any practice or course of business that would operate as a deceit. Plaintiffs contend that Idenix knew or should have known that Plaintiffs had not, in fact, abandoned their shares, based on its regular contacts with the Plaintiffs. They also contend that Idenix and its officers failed to inform Plaintiffs of material, non-public information that the company was on the brink of an acquisition, and unfairly profited from the sale and liquidation of Plaintiffs' shares prior to the Merck tender offer.

Count VII alleges that all Defendants violated the Securities Act of 1933, 15 U.S.C. §§ 77a–77bb, and the Securities and Exchange Act of 1934, 15 U.S.C. §§ 78a–78hh. Specifically, Plaintiffs contend that the improper escheat of Plaintiffs' shares without notice or due process violated the federal securities laws. Plaintiffs also assert that the Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder by employing devices, schemes, and artifices to wrongfully deprive Plaintiffs of their shares, and by making false statements of material fact and material omissions regarding Plaintiffs' shares.

In Count VIII, Plaintiffs allege that the Defendants violated their statutory duties under Massachusetts and Delaware state securities laws, to ensure that securities were not wrongly

transferred from one person to another. <u>See</u> Mass. Gen. Laws ch. 106, §§ 8-404, 8-405; 6 Del. C. §§ 8-404, 8-405.

Count IX alleges that all Defendants violated 42 U.S.C. § 1983, insofar as Computershare and Idenix "had a symbiotic and intertwined relationship with Delaware," such that Delaware, Computershare, and Idenix "jointly participated in the escheat" of Plaintiffs' shares. <u>See</u> Compl. ¶¶ 144–59. Accordingly, Plaintiffs contend that Defendants' wrongful acts were taken under "color of state law," subjecting them to liability under 42 U.S.C. § 1983.

Finally, Count X alleges that Defendants are liable for negligent misrepresentations, based on Computershare's erroneous statement that Plaintiffs' shares had been escheated to Massachusetts. Plaintiffs also allege that Computershare negligently and recklessly concealed material facts which they were under a legal duty to communicate. Plaintiffs contend that they relied on these misstatements and omissions to their detriment, and that Defendants are liable for the resulting $12,000,000 in damages.

As relief, Plaintiffs request compensatory, multiple, and punitive damages, attorneys' fees, costs, and pre and post-judgment interest.

**E.  Defendants' Motion to Stay**

On September 11, 2015, all Defendants filed a joint Motion to Stay this case pending the resolution of the Delaware state court proceedings. [ECF No. 35]. Defendants argue that where the outcome of this case "turns significantly" on the application of Delaware's Escheats Law, which is presently being litigated before the Delaware TAB and the Chancery Court, this Court should abstain from exercising its jurisdiction until the Delaware courts have adjudicated these threshold issues. Plaintiffs filed an Opposition to the Motion [ECF No. 42], and each party filed an additional reply brief [ECF Nos. 50, 54].

## II.    LEGAL STANDARD

The federal courts' obligation to exercise jurisdiction is "virtually unflagging[,]"

Colorado River, 424 U.S. at 817, and "[a]bstention from the exercise of federal jurisdiction is the

exception, not the rule." Id. at 813. Notably, "the pendency of an action in state court is not a per

se bar to related federal court proceedings." Casiano-Montanez v. State Ins. Fund Corp., 707

F.3d 124, 128 (1st Cir. 2013). "Abdication of the obligation to decide cases can be justified . . .

only in the exceptional circumstances where the order to the parties to repair to the state court

would clearly serve an important countervailing interest." Colorado River, 424 U.S. at 813

(quoting Allegheny Cty. v. Frank Mashuda Co., 360 U.S. 185, 188–89 (1959)).

Although the Supreme Court has outlined numerous abstention doctrines, see

Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 716–17 (1996), "the various types of abstention

are not rigid pigeonholes into which federal courts must try to fit cases," Pennzoil Co. v. Texaco,

Inc., 481 U.S. 1, 12 n.9 (1987). "Rather, they reflect a complex of considerations designed to

soften the tensions inherent in a system that contemplates parallel judicial processes." Id.

Here, Defendants argue that three different abstention doctrines justify staying this

federal action in deference to the lawsuits pending in the TAB and the Delaware Chancery Court.

First, the Supreme Court has held that abstention may be appropriate "in cases presenting a

federal constitutional issue which might be mooted or presented in a different posture by a state

court determination of pertinent state law." Colorado River, 424 U.S. at 814 (quoting Allegheny,

360 U.S. at 189). This is commonly referred to as "Pullman abstention," after the case of

Railroad Commission of Texas v. Pullman Co., 312 U.S. 496 (1941).

Second, even if no constitutional issue is presented, abstention may be warranted if the

case presents "difficult questions of state law bearing on policy problems of substantial public

import whose importance transcends the result in the case then at bar." Colorado River, 424 U.S.

at 814. This type of abstention is known as <u>Burford</u> abstention, in reference to <u>Burford v. Sun Oil</u>

<u>Co.</u>, 319 U.S. 315 (1943).

Finally, in <u>Colorado River</u>, the Supreme Court articulated an additional ground to stay or

dismiss a pending federal suit in favor of a state court proceeding, one which rests

> not on considerations of state-federal comity or on avoidance of
> constitutional decisions, as does abstention, but on "considerations
> of [w]ise judicial administration, giving regard to conservation of
> judicial resources and comprehensive disposition of litigation."

<u>Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.</u>, 460 U.S. 1, 14–15 (1983) (alteration in

original) (quoting <u>Colorado River</u>, 424 U.S. at 817) (further internal quotation marks and citation

omitted). "The crevice in federal jurisdiction that <u>Colorado River</u> carved," however, "is a narrow

one." <u>Jimenez v. Rodriguez-Pagan</u>, 597 F.3d 18, 27 (1st Cir. 2010). "Of all the abstention

doctrines, it is to be approached with the most caution, with '[o]nly the clearest of justifications'

warranting dismissal." <u>Id.</u> (quoting <u>Colorado River</u>, 424 U.S. at 819).

In <u>Moses H. Cone</u>, the Supreme Court noted that "[w]hen a district court decides to

dismiss or stay under <u>Colorado River</u>, it presumably concludes that the parallel state-court

litigation will be an adequate vehicle for the complete and prompt resolution of the issues

between the parties." 460 U.S. at 28. It further held that "[i]f there is any substantial doubt as to

this, it would be a serious abuse of discretion to grant the stay or dismissal at all." <u>Id.</u> The Court

also emphasized that staying or dismissing a case under the <u>Colorado River</u> doctrine requires

"exceptional circumstances." <u>Id.</u> at 19. When deciding whether such circumstances exist, the

district court may consider a non-exclusive list of factors including:

> (1) whether either court has assumed jurisdiction over a res; (2) the
> [geographical] inconvenience of the federal forum; (3) the
> desirability of avoiding piecemeal litigation; (4) the order in which
> the forums obtained jurisdiction; (5) whether state or federal law
> controls; (6) the adequacy of the state forum to protect the parties'

> interests; (7) the vexatious or contrived nature of the federal claim;
> and (8) respect for the principles underlying removal jurisdiction.

Jimenez, 597 F.3d at 27–28 (alteration in original) (quoting Rio Grande Cmty. Ctr. v. Rullan,

397 F.3d 56, 71–72 (1st Cir. 2005)).

## III.   DISCUSSION

### A.   Colorado River Abstention

As a threshold matter, it is not clear that the Colorado River doctrine is applicable here,

as the Court has substantial doubts about whether the Delaware Chancery action and the TAB

appeal will be "an adequate vehicle for the complete and prompt resolution of the issues between

the parties." Moses H. Cone, 460 U.S. at 28.

First and foremost, the defendants in each action are entirely different. In the Delaware

Chancery action and TAB appeal, only Delaware state officials are named as defendants. In this

action, the only defendants are the Computershare entities, Merck, and Idenix. Furthermore,

although Plaintiffs assert some similar causes of action in each lawsuit—e.g., negligence,

conversion, violation of Delaware Escheats Law—those claims are based on conduct that varies

with each defendant. Additionally, some of Plaintiffs' claims in this case, such as breach of

contract, violations of Chapter 93A, and breach of fiduciary duty, are not alleged at all in the

Delaware proceedings. Thus, the resolution of the Delaware actions may not entirely resolve

Plaintiffs' claims against Idenix, Computershare, and Merck in this case. Regardless of the

outcome of the dispute between Plaintiffs and the Delaware defendants, Plaintiffs may still have

viable claims against Computershare, Idenix, and/or Merck based upon those defendants' pre and

post-escheat conduct. Although the First Circuit has held that a "perfect identity of issues is not a

prerequisite" to Colorado River abstention, Currie v. Grp. Ins. Comm'n, 290 F.3d 1, 12 (1st Cir.

2002) (quoting Villa Marina Yacht Sales, Inc. v. Hatteras Yachts, 947 F.2d 529, 533 (1st Cir.

1991)), it seems clear that at least some of Plaintiffs' claims in this case are entirely independent of the Delaware Chancery action and TAB appeal. As a result, <u>Colorado River</u> abstention may not be appropriate here.

Furthermore, even assuming that the Court could stay this case under <u>Colorado River</u>, the requisite "exceptional circumstances" do not exist at this point in time.

The first factor (whether either court has assumed jurisdiction over a res) does not weigh in favor of abstaining from jurisdiction, as there is no physical property in dispute. Plaintiffs' shares were liquidated over seven years ago, and it would therefore be impossible for a court to order that the shares be returned to Plaintiffs. Instead, Plaintiffs seek damages to recoup the difference between the sale price and what they believe was the fair market value of their shares.

Nor does the second <u>Colorado River</u> factor favor a stay, because no party has argued that this federal forum is geographically inconvenient. Plaintiffs chose to file suit in the District of Massachusetts, the Computershare Defendants have principal places of business in this District, and neither Merck nor Idenix has argued that Massachusetts would be an inconvenient place for them to litigate. Accordingly, this factor does not favor abstention.

The fourth factor (the order in which the forums obtained jurisdiction) does not weigh heavily in favor of a stay, because the state court proceedings are not significantly more advanced than this lawsuit. In fact, the Delaware Chancery action is currently stayed pending a decision in the TAB appeal, which will not occur prior to the fall of 2016. As a result, neither this case nor the Chancery action has proceeded past the pleadings stage. Although the TAB appeal is undoubtedly more advanced, and the TAB is expected to rule on certain issues pertaining to the Delaware Escheats Law, the TAB is an administrative body, and its decision will almost certainly be appealed to the Chancery Court. In sum, a final judicial decision on the

relevant state law issues is not imminent. Thus, the Court finds that the order in which the courts obtained jurisdiction does not significantly favor a stay at this point in time.

The seventh and eighth factors are not applicable here, because there is no evidence that Plaintiffs filed their federal suit for any vexatious or contrived purpose. Similarly, this action was not removed to federal court, and thus there is no need to consider the principles underlying removal jurisdiction.

The third, fifth, and sixth factors—the desirability of avoiding piecemeal litigation; whether state or federal law controls; and the adequacy of the state forum to protect the parties' interests—are much more relevant, but point in different directions. Many of Plaintiffs' claims in this action depend, at least in part, on the interpretation of the Delaware Escheat Law. For example, Plaintiffs' negligence and conversion claims against Idenix, Computershare, and Merck are based in part on the Defendants' allegedly wrongful escheat of Plaintiffs' shares. When adjudicating these claims, this Court will likely be called upon to interpret and apply Delaware statutes, some of which have been recently amended. If those decisions were to conflict with the Delaware state courts' decision on the same issue, this Court's opinion would become merely advisory, which is "an outcome we seek to avoid in any case." See Currie, 290 F.3d at 11. On the other hand, the Delaware courts' final decision will not resolve all of the disputes between Plaintiffs and Defendants in this lawsuit. Thus, this case will likely proceed in some form, regardless of the outcome in the Chancery action.

After weighing these competing considerations, and given the Court's interest in moving this action along to the extent reasonably possible, the case will not be stayed at this point in time. The Court finds that it would be a more productive and efficient use of judicial resources to allow discovery in this case and in the Chancery action to proceed approximately in tandem. This

will provide all parties with an opportunity to explore the relevant facts, narrow down their

claims and defenses, and position this case for dispositive motions. After the close of discovery,

the Court will convene a status conference to discuss the progress of the Delaware state court

proceedings. If appropriate, the Defendants may renew their motion to stay at that time. If

dispositive motions are likely to involve controlling issues of state law that are still pending

before the Delaware Chancery Court, this Court may be more amenable to ordering a stay at that

point in time.

### B. Pullman Abstention

For similar reasons, the Court declines to abstain from jurisdiction based on Pullman

principles at this time, although Defendants may also renew their motion on Pullman grounds

after the close of discovery.

"Under Pullman, federal courts should abstain when '(1) substantial uncertainty exists

over the meaning of the state law in question, and (2) settling the question of state law will or

may well obviate the need to resolve a significant federal constitutional question.'" Casiano-

Montanez, 707 F.3d at 128–29 (quoting Batterman v. Leahy, 544 F.3d 370, 373 (1st Cir. 2008)).

In this case, Plaintiffs assert claims against the Defendants under 42 U.S.C. § 1983, on

the grounds that Computershare and Idenix acted under "color of state law" when they

wrongfully escheated Plaintiffs' shares to the State of Delaware, thereby depriving Plaintiffs of

their due process rights under the Fourteenth Amendment.

Further, Defendants have identified at least one unsettled question of state law that will

be resolved in the Chancery action, and which may obviate the need for the Court to reach

Plaintiffs' constitutional claims in this case. Specifically, the Delaware Escheats Law establishes

"periods of dormancy" for different types of property. If a property owner has failed to exercise

dominion or control over his or her property during the applicable period of dormancy, the holder of that property is obligated to make a report to the State Escheator, and eventually escheat the property to the State. See 12 Del. C. § 1198(9). Prior to June 30, 2008, the period of dormancy for stocks was five years. In June 2008, the Delaware legislature amended the law by, *inter alia*, reducing the period of dormancy for stocks from five years to three years. A.W. Fin. Servs., S.A. v. Empire Res., Inc., 981 A.2d 1114, 1119 (Del. 2009); see 12 Del. C. § 1198(9). In A.W. Financial Services, the Supreme Court of Delaware held that the new definition of "period of dormancy" did not apply retroactively to civil cases in which the stock had been escheated prior to June 30, 2008. Id. at 1119–20. Although Plaintiffs argue that there is no "unsettled" question of state law, because A.W. Financial Services held that the amendment did not apply retroactively, Defendants note that the court in A.W. Financial Services did *not* address whether the 2008 amendment applies retroactively to stocks that were escheated *after* the effective date of the amendment, but whose dormancy period began before the amendment went into effect. They argue that this is one of the issues that the Delaware Chancery Court will address at Plaintiffs' request.

After considering the holding in A.W. Financial Services, the Court agrees that the facts alleged in this action are slightly different, and that the holding in A.W. Financial Services is not necessarily controlling. Further, no Delaware state court has addressed the specific retroactivity issue raised here—namely, how the 2008 amendment to the Escheat Law affected dormancy periods in progress. It would be preferable for the Delaware state courts to address this issue in the first instance, and the resolution of this question may avoid the need to reach Plaintiffs' constitutional claim in this action.

The Court, however, remains concerned about the efficient management of judicial resources and the preservation of relevant evidence. As previously noted, some of the claims in this case will likely proceed, regardless of the outcome in the Delaware Chancery action, which may be many months or even years away. Accordingly, the Court will permit the parties to take discovery in this action, but will, if requested, revisit the <u>Pullman</u> abstention issue at the close of discovery and prior to briefing on dispositive motions. Defendants may renew their motion to stay at that time.

### C.  <u>Burford</u> Abstention

The underlying purpose of <u>Burford</u> abstention is to "prevent federal courts from bypassing a state administrative scheme and resolving issues of state law and policy that are committed in the first instance to expert administrative resolution." <u>Chico Serv. Station, Inc. v. Sol Puerto Rico Ltd.</u>, 633 F.3d 20, 29 (1st Cir. 2011) (quoting <u>Pub. Serv. Co. of N.H v. Patch</u>, 167 F.3d 15, 24 (1st Cir. 1998)). In determining whether to stay or dismiss an action based on <u>Burford</u>, the court must consider: "(1) the availability of timely and adequate state-court review, (2) the potential that federal court jurisdiction over the suit will interfere with state administrative policymaking, and (3) whether conflict with state proceedings can be avoided by careful management of the federal case." <u>Id.</u> at 32.

Although <u>Burford</u>'s deference to administrative bodies "could be interpreted expansively, requiring that federal courts 'abstain from hearing any case involving state regulatory policies,'" <u>id.</u> at 29–30 (quoting <u>Vaqueria Tres Monjitas, Inc. v. Irizarry</u>, 587 F.3d 464, 473 (1st Cir. 2009)), the First Circuit has "declined to give it so broad a reading." <u>Id.</u> at 30. Instead, <u>Burford</u> abstention should apply only in "unusual circumstances" when "federal review risks having the

district court become the regulatory decision-making center." Id. (further internal quotation marks and citation omitted).

Here, Plaintiffs have a pending administrative claim before the DOUP and the TAB, which gives them an opportunity to litigate, before the responsible administrative bodies, their primary claim that the Delaware defendants wrongfully escheated their shares under the Delaware Escheat Law, and that they are entitled to the fair market value of their liquidated shares. For reasons described above, however, the Plaintiffs' claims in this case are substantially broader than the claims presented in the TAB appeal, and involve entirely different defendants. Therefore, the state administrative remedy may not be entirely adequate. See Nat'l Ass'n of Gov't Employees v. Mulligan, 849 F. Supp. 2d 167, 175 (D. Mass. 2012). Further, although the Court is not inclined to wrest a state law question of first impression away from the Delaware courts, allowing discovery to proceed in this matter poses no threat to state administrative policymaking, particularly where the Court is willing to revisit the issue after the close of discovery, and prior to making a dispositive legal ruling. If appropriate, Defendants may renew their Burford arguments at that time.

## IV.     CONCLUSION

For the foregoing reasons, Defendants' Motion to Stay [ECF No. 35] is hereby **DENIED**, without prejudice to renew after the close of discovery. The Court will convene a Rule 16 Scheduling Conference in the next thirty days.

**SO ORDERED.**

Dated: September 13, 2016

/s/ Allison D. Burroughs
ALLISON D. BURROUGHS
U.S. DISTRICT JUDGE